## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JASON PARKMAN | * | CIVIL ACTION |
| | * | NO. 3:20-cv-883 |
| VERSUS | * | |
| | * | JUDGE JOHN W. |
| W&T OFFSHORE, INC.; BAKER HUGHES | * | DEGRAVELLES |
| ENERGY SERVICES LLC; BAKER HUGHES | * | |
| OILFIELD OPERATIONS LLC; | * | MAG. JUDGE ERIN |
| HALLIBURTON COMPANY; | * | WILDER-DOOMES |
| HALLIBURTON ENERGY SERVICES, INC.; | * | |
| HELMERICH & PAYNE, INC.; HELMERICH | * | |
| & PAYNE INTERNATIONAL DRILLING CO; | * | |
| AND HELMERICH & PAYNE | * | |
| OFFSHORE, LLC | * | |

**************************************************

### PLAINTIFF'S OPPOSITION TO DEFENDANT W&T OFFSHORE INC.'S MOTION FOR SUMMARY JUDGMENT

The plaintiff, Jason Parkman, opposes the motion for summary judgment filed by the defendant W&T Offshore, Inc. ("W&T").[1]  For the reasons that follow, genuine factual issues permeate W&T's motion, warranting its denial.

### I.    INTRODUCTION

Mr. Parkman was paralyzed on an oil rig while being lifted in the air in preparation for an inspection. This suit against W&T, among others, followed. Discovery revealed that W&T not only knew about the hazards involved in the hoisting operation, but directly created them through its negligent practices as well as its violations of BSEE regulations and its own safety policies and procedures. Yet, despite overwhelming evidence of its negligence, W&T denies any liability for Mr. Parkman's injuries. In its latest attempt to prevent this case—and the overwhelming body of evidence showing its negligence—from reaching the jury, W&T moved the Court to dismiss all the plaintiff's

---

[1]    Rec. Doc. 143, W&T's motion for summary judgment.

claims against it. Its motion, however, is not only riddled with genuine factual issues—but the record evidence clearly establishes W&T's liability. And for two simple reasons.

*First,* the plaintiff concedes that W&T and the plaintiff's employer, Helmerich & Payne ("H&P"), had an independent contractor relationship. But the two exceptions to the independent contractor defense that are at play here—operational control and authorization of an unsafe work practice—still make W&T vicariously liable for Mr. Parkman's injuries.

Indeed, at the time of his injury, Mr. Parkman was not performing the actual inspection. Rather, **before** Mr. Parkman was even able to do his task, he was injured while still being lifted into a position to perform it. And the hazards of the lifting operation were created and controlled—not by H&P—but by W&T. In its control over the hoisting, W&T callously placed Mr. Parkman's life at risk by (1) raising the top drive that Mr. Parkman was supposed to inspect at dangerous heights, requiring Mr. Parkman to be lifted almost **90 feet** off the rig floor, (2) parking the top drive partly above and partly below the monkey board, thereby requiring Mr. Parkman to be lifted through  a **tight** area where the risk of coming into contact with various components in a narrow part of the derrick was exponentially increased, and (3) neglecting to require an auto-stop winch with overpull mechanism that would have automatically shut itself off the very moment that Mr. Parkman's lanyard got snugged. The evidence on two key points is undisputed. One, it was **W&T** that made all three of these decisions. And two, each of these three scenarios—in its own right, but especially in tandem—caused this incident.

Further, W&T did not only make Mr. Parkman's lift incredibly dangerous; W&T also specifically allowed it to proceed. And W&T did so by, in violation of its own policies and procedures as well as federal law, failing to (1) conduct a proper Job Safety Analysis ("JSA") for the hoisting operation, and (2) train its company man to sign the JSA—and to do so only after verifying that the risks involved were mitigated to the lowest extent practicable. As a result of W&T's failures, its company man on duty did ***neither***—thereby increasing the very risks that he had a duty to minimize, contributing to this incident.

And *second*, vicarious liability aside, W&T was independently negligent in causing Mr. Parkman's injuries. Contrary to W&T's argument, the plaintiff does not argue that W&T's duty to prevent this incident stemmed from federal safety regulations that apply to its drilling operations. Rather, the source of W&T's duty is the fact that W&T ***created*** the very hazard that paralyzed Mr. Parkman. So it only follows, under the law—and, frankly, logic—that W&T should have protected Mr. Parkman from the hazardous condition that it had created. W&T's failure to do so at every turn is grounds to charge it with negligence.

The net sum of the above is straightforward: W&T's summary judgment must be denied in light of the record evidence.

## II.  BACKGROUND

### A.    The drill pipe gets stuck causing significant delays in drilling operations.

W&T, the owner and operator of a fixed platform located on the Outer Continental Shelf in the Gulf of Mexico, entered into a lease with the federal government

to drill for oil and gas at Ship Shoal Block 349.[2] So W&T hired H&P to provide a drilling rig to drill an oil well.[3] H&P, drilling the well at W&T's directions,[4] had two crews working on the rig—the day crew and the night crew—working 12-hour shifts, called "tours."[5] During the drilling operations conducted by the day drilling crew from 6 a.m. to 6 p.m., the bottomhole assembly[6] became stuck in the well's salt formation downhole[7]—disabling the drillstring from rotating or moving vertically. This caused the entire drilling operation to shut down for hours and was threatening to undermine W&T's production quota.[8]

Mr. Parkman was an H&P's employee who worked as a roughneck/floor hand on the night drilling crew, from 6 p.m. to 6 a.m.[9] In order to free the stuck pipe and enable normal drilling operations to resume, Mr. Parkman's night crew had to "jar" the pipe.[10] During this "jarring" operation, a mechanical device used downhole delivers violent,

---

[2]     Rec. Doc. 143-24, the BSEE report, p. 2 of 4. *See also* Exhibit 6, H&P corporate deposition, p. 93:8-14; Exhibit 1, W&T corporate deposition, p. 153:10-17 and p. 155:11-24.

[3]     Exhibit 2, Deposition of Andy Cline, p. 26:10-19. *See also* Rec. Doc. 143-24, BSEE report, p. 2 of 4; Exhibit 6, H&P corporate representative, p. 21:2-4; Rec. Doc. 134-11, Edward Ziegler's report, p. 6 of 30; Exhibit 12, Deposition of Willis (Tot) Lee, p. 13:5-11; Exhibit 3, Deposition of Atlas Harrington, p. 125:11-19.

[4]     Exhibit 5, Deposition of Jason Parkman, p. 36:13-20; Exhibit 6, H&P corporate deposition, p. 23:2-6 and pp. 44:2-45:11.

[5]     Exhibit 8, Deposition of Ralph Stevens, Jr., p. 15:13-22; Exhibit 9, Deposition of Robert Myers, Jr., p. 36:12-22.

[6]     The bottom hole assembly is the lower portion of the drill string, consisting of several components including the drill bit (used to crush or cut rock formations), a drillpipe, and jarring devices.

[7]     Exhibit 5, Deposition of Jason Parkman, pp. 42:5-44:8; Exhibit 7, Deposition of Scotty Brubaker, pp. 25:11-26:4.

[8]     *Id.*

[9]     Exhibit 5, Deposition of Jason Parkman, p. 32:1-10 and pp. 36:21-38:13.

[10]    Exhibit 5, Deposition of Jason Parkman, pp. 42:5-45:13; Rec. Doc. 134-11, Edward Ziegler's report, pp. 9-10 of 30, para. 1.16.

hammer-like impacts onto the stuck drillstring to free it from its under-the-ground obstruction.[11] While usually very brief, the jarring that took place on August 25, 2018 lasted for hours before the stuck pipe was successfully freed.[12] And despite the fact that W&T was unable to resume its normal drilling operations and was being inefficient during this entire time, W&T was still obligated to pay H&P for all of its work.[13]

**B.    Although aware that H&P had to conduct a post-jarring inspection, W&T decides to park the top drive at dangerous heights.**

Because jarring is an intense event that causes the entire rig to shake,[14] H&P's policy and standard industry practice—as well as the manual of the top drive's manufacturer[15]—required H&P's crew to conduct post-jarring inspection of the rig derrick and the top drive before the drilling operation could resume.[16] The rig derrick is a tall, pyramidal or A-shaped support structure over an oil well that holds the drilling machinery and allows it to be raised and lowered.[17] The top drive—located inside of the derrick—is a big, rotating motor system connected to the drillstring that has the ability to

---

[11]    Exhibit 6, H&P corporate deposition, p. 138:3-7 and p. 268:7-11; Exhibit 8, Deposition of Ralph Stevens, Jr., p. 13:4-20; Exhibit 9, Deposition of Robert Myers, Jr., p. 30:8-21; Exhibit 11, Deposition of Tommie Bridges, pp. 70:14-71:8.

[12]    Exhibit 3, Deposition of Atlas Harrington, pp. 83:17-84:3; Exhibit 5, Deposition of Jason Parkman, pp. 43:22-44:1 and p. 196:14-16; Exhibit 6, H&P corporate deposition, p. 27:3-6; Exhibit 11, Deposition of Tommie Bridges, p. 18:3-11.

[13]    Exhibit 6, H&P corporate deposition, p. 315:15-24; Exhibit 7, Deposition of Scotty Brubaker, p. 39:6-18.

[14]    Exhibit 9, Deposition of Robert Myers, Jr., p. 30:8-21.

[15]    Exhibit 6, H&P corporate deposition, pp. 267:12-268:6; Rec. Doc. 135-6, Eugene Sweeney's report, p. 10 of 25.

[16]    Exhibit 5, Deposition of Jason Parkman, p. 48:3-11 and p. 174:18-21; Exhibit 6, H&P corporate deposition, pp. 27:3-28:18; Exhibit 11, Deposition of Tommie Bridges, pp. 24:13-25:2.

[17]    Exhibit 5, Deposition of Jason Parkman, pp. 152:1-153:6.

travel vertically up and down the derrick and impart torque to the drill pipe.[18] The post-jarring inspection of the derrick and the top drive helps reduce the risk that the strong vibrations caused by (extensive) jarring could have loosened up some components that could present a struck-by hazard.[19]

And W&T's senior day company man, Atlas Harrington, *knew*—well ahead of time—that H&P had to inspect the top drive once the pipe was freed and once there was no risk of it getting stuck again.[20]  Ensuring that the pipe would not get stuck again, further delaying its drilling operations, seems to have been W&T's only concern.[21]

Indeed, the pipe was stuck in the wellbore's salt formation at 7,714 feet.[22] Once the pipe was freed, Mr. Harrington's first concern was to pull the drillstring out of the wellbore far enough from the salt formation to avoid the risk of getting it stuck again.[23] Notably, the higher the drillstring is pulled up out of the wellbore and above the rig floor, the **lesser** are the chances of it getting stuck again.[24] And in order to prevent the drillstring from getting stuck again, W&T decided to do three things.

---

[18]    Exhibit 6, H&P corporate deposition, pp. 68:20-70:1.

[19]    Exhibit 2, Deposition of Andy Cline, pp. 69:11-70:7; Exhibit 3, Deposition of Atlas Harrington, p. 31:8-18 and pp. 32:9-33:22; Exhibit 5, Deposition of Jason Parkman p. 48:3-11; Exhibit 6, H&P corporate deposition, p. 31:17-24.

[20]    Exhibit 1, W&T corporate deposition, pp. 172:2-173:6; Exhibit 3, Deposition of Atlas Harrington, pp. 82:16-84:3; Exhibit 4, Deposition of Keim Davis, pp. 79:22-82:4; Exhibit 6, H&P corporate deposition, p. 268:2-16; Exhibit 7, Deposition of Scotty Brubaker, p. 35:13-24 and p. 40:13-18.

[21]    Exhibit 3, Deposition of Atlas Harrington, p. 44:18-22.

[22]    Exhibit 1, W&T corporate deposition, p. 71:2-9 and pp. 74:23-75:2. Exhibit 7, Deposition of Scotty Brubaker, p. 32:4-9; Exhibit 23, top drive position and salt location data.

[23]    Exhibit 3, Deposition of Atlas Harrington, pp. 49:21-50:1.

[24]    Exhibit 3, Deposition of Atlas Harrington, pp. 61:25-62:17, p. 63:6-22, and p. 67:9-22.

*First*, W&T decided to weight up the mud.[25] Mud is a drilling fluid used, among other things, to clean the hole by lifting cuttings—rock fragments that break away during the drilling operations—to the surface.[26] Weighting up the mud produces higher hydrostatic pressure at the bottom of the hole to keep its walls from collapsing in.[27]

*Second,* after weighting up the mud, W&T decided to circulate the hole.[28] During circulation, the hole is flushed as the drilling fluid (1) is pumped into the hole through the drill bit—the bottom of the drillstring used to cut rock, and (2) recircles back through the annulus—the space between the openhole and an outer diameter, where the drilling fluid can flow.[29] The decision on how long to circulate the hole before shutting down the mud pumps is made by W&T.[30] Also, during this circulating process, the drillstring connected to the top drive moves up and down to help keep the pipe free from any obstructions.[31]

And *third*, through Mr. Harrington, W&T decided to pull the drillstring up to 7,653 feet in the wellbore, or 61 feet (7,714 - 7,653) up from where the bottomhole assembly was actually stuck in the hole.[32] This, in turn, meant that Mr. Harrington

---

[25]    Exhibit 7, Deposition of Scotty Brubaker, p. 47:2-5.

[26]    Exhibit 5, Deposition of Jason Parkman, p. 44:14-19.

[27]    Exhibit 6, H&P corporate deposition, p. 231:4-15; Exhibit 7, Deposition of Scotty Brubaker, pp. 94:25-95:12 and pp. 103:19-104:7.

[28]    Exhibit 7, Deposition of Scotty Brubaker, p. 47:2-5.

[29]    Exhibit 5, Deposition of Jason Parkman, pp. 44:20-45:13 and p. 50:12-19; Exhibit 6, H&P corporate deposition, pp. 33:9-34:11; Exhibit 11, Deposition of Tommy Bridges, p. 18:12-20.

[30]    Exhibit 10, Deposition of Ronnie Atkinson, p. 23:9-16.

[31]    Exhibit 7, Deposition of Scotty Brubaker, pp. 45:20-46:3; Exhibit 13, Deposition of Stephen Walker, p. 12:19-24.

[32]    Exhibit 1, W&T corporate deposition, pp. 73:6-74:8 and p. 75:18-25; Exhibit 23, top drive position and salt location data.

decided to "park" the top drive approximately 60-plus feet above the rig floor.[33] And this was problematic for no less than three reasons.

One, W&T knew that H&P crew had to inspect the top drive before the normal drilling operations could resume.[34] And the safest way to do so would be to lower the top drive to the rig floor *as close as possible*.[35] By parking the top drive at *60-plus feet* above the rig floor, W&T made an already risky task that much more dangerous.

Two, because the derrick is A-shaped, it gets narrower with height and has more components on which one could get caught up.[36]

And three, W&T parked the top drive—not only at an unsafe height—but also in an unsafe position, *i.e., partly above and partly below* the monkey board.[37] The monkey board is a small, flat platform above the rig floor which serves as a walkway for the crew and which can be raised or lowered to the appropriate height in the derrick. And the monkey board, which was sitting at *85-87 feet* off the rig floor,[38] has

---

[33]    Exhibit 3, Deposition of Atlas Harrington, p. 35:6-22; Exhibit 5, Deposition of Jason Parkman, p. 183:19-24; Exhibit 6, H&P corporate deposition, p. 137:15-18 and p. 261:6-24; Exhibit 7, Deposition of Scotty Brubaker, p. 92:4-8; Exhibit 27, Deposition sketch by Tommy Bridges.

[34]    Exhibit 1, W&T corporate deposition, pp. 172:2-173:6; Exhibit 3, Deposition of Atlas Harrington, pp. 82:16-84:3; Exhibit 4, Deposition of Keim Davis, pp. 79:22-82:4; Exhibit 6, H&P corporate deposition, p. 268:2-16; Exhibit 7, Deposition of Scotty Brubaker, p. 35:13-24 and p. 40:13-18.

[35]    Exhibit 4, Deposition of Keim Davis, pp. 74:19-75:4; Exhibit 5, Deposition of Jason Parkman, pp. 83:3-84:21; Exhibit 13, Deposition of Stephen Walker, pp. 48:22-49:24.

[36]    Exhibit 5, Deposition of Jason Parkman, pp. 152:1-153:6; Exhibit 6, H&P corporate deposition, pp. 270:21-271:21; Exhibit 10, Deposition of Ronnie Atkinson, pp. 31:25-32:6; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 48:25-49:14.

[37]    Exhibit 1, W&T corporate deposition, p. 19:1-7; Exhibit 4, Deposition of Keim Davis, pp. 75:6-76:5; Exhibit 6, H&P corporate deposition, p. 263:3-16; Exhibit 7, Deposition of Scotty Brubaker, p. 52:3-10; Exhibit 10, Deposition of Ronnie Atkinson, p. 21:3-14.

[38]    Exhibit 1, W&T corporate deposition, p. 21:3-9; Exhibit 3, Deposition of Atlas Harrington, 35:6-22; Exhibit 6, H&P corporate deposition, p. 262:7-13; Exhibit 13,

"fingers"—protruding steel beams with slots between them used to hold up vertical stands of pipes.[39] This created a "tight gap" between the monkey board and its fingers and a 15-foot wide top drive[40] high up in the pyramidal derrick through which one had to be lifted to be able to conduct a post-jarring inspection.[41]

Notably, it is ***undisputed*** that the decisions on how high to pull up the drillstring above the rig floor and where to park the top drive were made by ***W&T***.[42] And the record evidence shows that these W&T's decisions directly contributed to this incident.

### C.    W&T's decision to park the top drive partly above and partly below the monkey board at 60-plus feet off the rig floor makes Mr. Parkman's injuries imminent.

Mr. Parkman was among the two H&P crew members designated to inspect the derrick and the top drive.[43] As a result of W&T's decisions, this required him to be air lifted almost ***90 feet*** off the rig floor by a man-riding winch operated by an H&P

---

Deposition of Stephen Walker, pp. 24:20-26:13; Exhibit 27, Deposition sketch by Tommy Bridges.

[39]    Exhibit 4, Deposition of Keim Davis, p. 46:7-14; Exhibit 7, Deposition of Scotty Brubaker, pp. 108:24-109:7; Exhibit 13, Deposition of Stephen Walker, p. 78:2-8.

[40]    Exhibit 1, W&T corporate deposition, p. 146:17.

[41]    Exhibit 1, W&T corporate deposition, pp. 21:18-22:11; Exhibit 4, Deposition of Keim Davis, pp. 75:6-76:5; Exhibit 6, H&P corporate deposition, p. 236:15-24 and pp. 271:22-272:6; Exhibit 13, Deposition of Stephen Walker, p. 97:21-25.

[42]    Exhibit 1, W&T corporate deposition, p. 44:4-9 and pp. 165:16-166:11; Exhibit 7, Deposition of Scotty Brubaker, p. 29:12-17, pp. 39:21-40:5, p. 42:20-25, p. 91:9-23, and pp. 124:14-125:15; Exhibit 3, Deposition of Atlas Harrington, p. 51:13-23, p. 73:21-25, pp. 79:19-80:2, and p. 84:18-24; Exhibit 4, Deposition of Keim Davis, p. 79:2-14 and p. 96:14-16; Exhibit 6, H&P corporate deposition, p. 266:5-21, p. 274:18-275:17, and p. 304:19-24; Exhibit 10, Deposition of Ronnie Atkinson, p. 23:5-16 and p. 30:9-21; Exhibit 11, Deposition of Tommy Bridges, pp. 23:5-24:12, pp. 28:19-29:2p. 31:3-13, pp. 61:15-62:3, p. 153:16-1, and p. 154:15-25; Exhibit 13, Deposition of Stephen Walker, pp. 13:2-15:15 and pp. 50:18-51:10; Rec. Doc. 134-11, Edward Ziegler's report, p. 11 of 30, para. 1.19.

[43]    Exhibit 5, Deposition of Jason Parkman, pp. 55:21-5 and pp. 67:20-68:17; Exhibit 13, Deposition of Stephen Walker, p. 16:11-21.

toolpusher, Ronnie Atkinson.[44] Mr. Parkman was fitted into a bosun chair harness that was attached to a lifting cable on the winch.[45] A lanyard, a nylon strap that clips into the back of the harness, hooked Mr. Parkman's harness to a cable grab and to a static line.[46] The static line is a steel cable that hangs down from the top of the derrick to the rig floor that serves as a secondary fall protection.[47] As the cable grab moves upwards during the lift, it allows the static line to pass freely through it.[48] But, in the event that the lifting cable on the winch snaps, the cable grab will snag the static line and arrest the fall.[49]

As Mr. Parkman was being hoisted to conduct the post-jarring inspection—which he never got a chance to do[50]—his lanyard got caught up on one of the monkey board's fingers.[51] And while Mr. Atkinson immediately stopped the winch upon seeing Mr. Parkman's arms flailing, it was already too late.[52] With two strong forces pulling his body in opposite directions and "squeezing the life out of [him]",[53] Mr. Parkman—only

---

[44]  Exhibit 5, Deposition of Jason Parkman, pp. 68:25-69:14; Exhibit 6, H&P corporate deposition, pp. 291:12-292:12; Exhibit 10, Deposition of Ronnie Atkinson, pp. 11:7-12:12.

[45]  Exhibit 13, Deposition of Stephen Walker, pp. 73:18-74:20.

[46]  Exhibit 4, Deposition of Keim Davis, pp. 45:11-46:10; Exhibit 5, Deposition of Jason Parkman, p. 91:6-13; Exhibit 6, H&P corporate deposition, p. 88:14-18and pp. 117:16-118:1.

[47]  Exhibit 4, Deposition of Keim Davis, pp. 45:11-46:10; Exhibit 5, Deposition of Jason Parkman, p. 91:1-13 and pp. 119:20-121:21; Exhibit 6, H&P corporate deposition, p. 117:4-7.

[48]  Exhibit 6, H&P corporate deposition, pp. 117:16-118:1.

[49]  Exhibit 4, Deposition of Keim Davis, pp. 45:11-46:10.

[50]  Exhibit 6, H&P corporate deposition, p. 308:7-11; Exhibit 13, Deposition of Stephen Walker, p. 87:9-20.

[51]  Exhibit 4, Deposition of Keim Davis, pp. 45:11-46:10; Exhibit 5, Deposition of Jason Parkman, p. 74:10-20; Exhibit 6, H&P corporate deposition, p. 62:17-20.

[52]  Exhibit 10, Deposition of Ronnie Atkinson, pp. 14:10-15:19.

[53]  Exhibit 5, Deposition of Jason Parkman, p. 118:9-14.

23 years old at the time of the incident[54]—was instantaneously rendered paraplegic and suffered life-altering injuries.[55]

But the evidence shows that this incident should have never occurred. In fact, as it will shown below, the evidence affirmatively establishes that W&T had no less than **four** ways to prevent Mr. Parkman's injuries.

> **D.     W&T's (in)actions become indefensible in light of the evidence; W&T had, not only the opportunity, but also a *duty* to at least minimize—if not completely eliminate—the risks involved.**

As an operator under a contract with the federal government and the ultimate work authority on its platform,[56] W&T had a duty under federal law—not only to prevent Mr. Parkman's injury[57]—but also to reduce the risk of the hoisting operation "to the lowest level practicable."[58] Indeed, according to the "hierarchy of controls" developed by the National Institute for Occupational Safety and Health ("NIOSH")—that is used by the Occupational Safety and Health Administration ("OSHA"), among others, to control exposures to hazards in the workplace—there are five levels of actions to eliminate or minimize hazards.[59] Listed in the order based on their general effectiveness, those actions are:

---

[54]   *Id.* at p. 9:1-2.

[55]   Exhibit 5, Deposition of Jason Parkman, pp. 124:2-124:25 and pp. 143:22-147:3.

[56]   Exhibit 5, Deposition of Jason Parkman, p. 193:8-16 and p. 200:6-10; Exhibit 11, Deposition of Tommy Bridges, p. 81:20-25; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 24:21-25:18; Rec. Doc. 134-11, Edward Ziegler's report, pp. 8-9 of 30, paras. 1.8 and 1.11.

[57]   CFR § 250.106(b). *See also* Exhibit 1**,** W&T corporate deposition, pp. 153:14-155:6 and p. 155:14-24.

[58]   CFR § 250.107(a)(3). *See also* Exhibit 1**,** W&T corporate deposition, pp. 150:14-151:11; Exhibit 6, H&P corporate deposition, pp. 294:23-295:10.

[59]   Exhibit 25, NIOSH hierarchy of controls.



With the exception of PPE (personal protective equipment), which is not implicated here,[61] W&T failed to undertake any of these actions—each of which would have, individually but especially in combination—prevented this incident.[62]

1. ***Elimination*: Fearing further delays, W&T decides not to break out a triple that would have completely eliminated the need for the lift.**

Any operation that involves lifting personnel in the air is inherently risky. So the first thing that must be considered with any lift is whether the same could be avoided.[63] And here, W&T could have entirely avoided lifting Mr. Parkman in the air.[64]

Namely, the drilling rig in question is set up for triples—meaning that it can hold three lengths of a 30-foot drill pipe, called a "stand" or a "joint" of a pipe, in the

---

[60]    *Id. See also* Exhibit 6, H&P corporate deposition, pp. 256:23-259:18; Exhibit 7, Deposition of Scotty Brubaker, pp. 130:22-131:19; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 40:15-44:22 and p. 54:9-25.

[61]    Exhibit 6, H&P corporate deposition, p. 260:5-18.

[62]    Rec. Doc. 134-11, Edward Ziegler's report, p. 14 of 30.

[63]    Exhibit 1, W&T corporate deposition, p. 26:9-15 and p. 30:10-23; Exhibit 6, H&P corporate deposition, pp. 81:16-82:23, p. 83:3-20, and p. 270:12-21

[64]    Exhibit 13, Deposition of Stephen Walker, p. 50:5-11.

derrick.[65] Here, by pulling up the drillstring approximately 60-plus feet above the rig floor, W&T's Mr. Harrington had essentially raised the top drive by two joints of pipe.[66] But there was admittedly nothing preventing Mr. Harrington to "break out a triple"[67]—*i.e.,* to (1) raise the whole stand, all three joints of pipe, at **90 feet** off the rig floor, (2) disconnect it from the rest of the drillstring and rack it back in the derrick, and (3) lower the top drive ***all the way to the floor*** to connect it to the next piece of pipe in the hole.[68] Doing so would have achieved three things.

*One*, it would have completely eliminated the need to lift Mr. Parkman in the air because—with the top drive being close to the rig floor—the post-jarring inspection could have been conducted on a ladder.[69] *Two*, it would have also eliminated the risk of having the drillstring stuck again because—by virtue of being pulled up 30 feet higher off the rig floor—the drillstring was less likely to get re-stuck.[70] And *three*, breaking out a triple would have been easier because the rig was designed for triples.[71]

By comparison, the only risk involved with breaking out a triple prior to conducting a post-jarring inspection would have been the risk of falling objects that

---

[65]    Exhibit 3, Deposition of Atlas Harrington, p. 35:6-22 and pp. 37:25-39:23; Exhibit 6, H&P corporate deposition, p. 137:19-25.

[66]    Exhibit 6, H&P corporate deposition, 137:19-25; Exhibit 11, Deposition of Tommy Bridges, p. 29:3-11.

[67]    Exhibit 3, Deposition of Atlas Harrington, p. 46:2-11 and p. 60:21-24.

[68]    Exhibit 3, Deposition of Atlas Harrington, pp. 65:6-67:4 and pp. 67:23-69:11; Exhibit 13, Deposition of Stephen Walker, pp. 31:11-32:17 and pp. 46:14-47:22.

[69]    Exhibit 3, Deposition of Atlas Harrington, pp. 67:23-69:11; Exhibit 5, Deposition of Jason Parkman, pp. 115:14-117:15.

[70]    Exhibit 3, Deposition of Atlas Harrington, pp. 61:25-62:17, p. 63:6-22, and p. 67:9-22.

[71]    Exhibit 11, Deposition of Tommy Bridges, p. 29:12-21.

may have potentially gotten loose while jarring.[72] However, the top drive was moving up and down during the post-jarring circulating process[73] and no objects had fallen down to the rig.[74] Another disadvantage for W&T is that breaking out a triple would have caused a few-minute delay in W&T restoring its normal drilling operations.[75]

> **2.** *Substitution*: **W&T refuses to listen to H&P and lower the top drive below the monkey board, which would have eliminated the caught-in hazard.**

If an operation cannot be performed by completely eliminating the need for hoisting personnel, the next concern is to ***minimize the height*** to which the personnel must be lifted.[76] Even the H&P's pre-job checklist for personnel hoisting—in red, bolded letters—asked whether there was "alternative method available" to perform the task without personnel hoisting."[77] In fact, as a matter of standard and routine practice, H&P conducted the top drive inspections <u>as close to the floor as possible</u>[78]—but,

---

[72]   Exhibit 6, H&P corporate deposition, p. 308:13-19, p. 309:16-25, and pp. 313:22-314:4.

[73]   Exhibit 10, Deposition of Ronnie Atkinson, pp. 23:21-24:1; Exhibit 11, Deposition of Tommy Bridges, pp. 64:19-65:23, pp. 66:4-68:2, and p. 71:9-12.

[74]   Exhibit 1, W&T corporate deposition, pp. 45:24-47:9; Exhibit 7, Deposition of Scotty Brubaker, p. 34:14-21; Exhibit 11, Deposition of Tommy Bridges, pp. 71:19-72:18.

[75]   Exhibit 3, Deposition of Atlas Harrington, pp. 47:13-48:21, pp. 50:2-52:4, p. 54:2-6, and p. 71:2-19.

[76]   Exhibit 1, W&T corporate deposition, p. 58:14-17 and p. 175:5-14. *See also* Exhibit 2, Deposition of Andy Cline, pp. 39:24-41:17; Exhibit 3, Deposition of Atlas Harrington, pp. 122:1-123:7; Exhibit 4, Deposition of Keim Davis, p. 107:12-17; Exhibit 6, H&P corporate deposition, p. 269:21-25; Exhibit 7, Deposition of Scotty Brubaker, p. 24:12-25; Exhibit 11, Deposition of Tommy Bridges, p. 25:9-20; Exhibit 13, Deposition of Stephen Walker, pp. 26:23-27:5.

[77]   Exhibit 21, H&P pre-job checklist at H&P-Parkman 0083. *See also* Exhibit 22, H&P personnel hoisting/manriding policy, para. 39.2.

[78]   Exhibit 4, Deposition of Keim Davis, pp. 74:19-75:4; Exhibit 6, H&P corporate deposition, pp. 273:18-275:10; Exhibit 7, Deposition of Scotty Brubaker, p. 50:15-24; Exhibit 9, Deposition of Robert Myers, Jr., pp. 21:15-23:11 and p. 23:15-20; Exhibit 11, Deposition of Tommy Bridges, pp. 26:2-27:19.

certainly, *below* the monkey board.[79] This is further confirmed by the fact that (1) despite having ridden in a harness hundreds of times prior to the incident—Mr. Parkman was never hoisted above the monkey board,[80] and (2) H&P had to issue a permit for this job to proceed, which is otherwise not needed for their post-jarring inspections done below the monkey board.[81]

Perhaps this is exactly why—after seeing that Mr. Harrington had parked the top drive partly above and partly below the monkey board—H&P crew asked W&T's night company man, Scotty Brubaker, to lower the top drive below the monkey board.[82] To be clear, while their memory years after the incident on who exactly made this request to W&T may slightly vary, the H&P crew members testified that W&T was specifically asked to *lower the top drive below the monkey board* for inspection.[83] And in making this request, H&P was technically exercising its stop work authority.[84] But they were "overruled."[85] Mr. Brubaker admitted that an H&P crew member asked him to lower the top drive—but feeling that he did not have the authority to do so without first

---

[79]    Exhibit 1, W&T corporate deposition, pp. 244:1-23; Exhibit 11, Deposition of Tommy Bridges, p. 87:19-22.

[80]    Exhibit 5, Deposition of Jason Parkman, p. 61:3-5 and p. 171:16-20.

[81]    Exhibit 6, H&P corporate deposition, p. 344:13-16; Exhibit 11, Deposition of Tommy Bridges, pp. 86:25-87:5 and pp. 101:17-102:23.

[82]    Exhibit 5, Deposition of Jason Parkman, pp. 54:4-55:23.

[83]    *Id. see also* Exhibit 11, Deposition of Tommy Bridges, pp. 92:13-95:25 and pp. 96:20-98:7; Exhibit 13, Deposition of Stephen Walker, pp. 28:17-30:2 and pp. 38:20-39:9.

[84]    Exhibit 5, Deposition of Jason Parkman, pp. 81:17-82:6; Exhibit 1, W&T corporate deposition, pp. 34:8-36:19; Rec. Doc. 134-11, Edward Ziegler's report, p. 17 of 30.

[85]    Exhibit 5, Deposition of Jason Parkman, pp. 42:5-43:10, pp. 57:17-59:23, p. 63:1-13, and p. 151:13-22.

waking up Mr. Harrington[86] (and perhaps avoiding any further delays)—Mr. Brubaker, declined H&P's request.[87] As a result, H&P "forcefully" answered "no" to the question of whether alternative methods existed to perform the hoisting operation.[88]

But lowering the top drive ***mere 10 to 15 feet*** to bring it fully below the monkey board made perfect sense.[89] Three points stand out.

*One*, this could have been done slowly as to prevent any potentially loose objects from falling from the top drive to the rig floor (and none had fallen from it during the circulating process).[90] *Two,* this falling hazard was not an issue, anyway, since the top drive could have been lowered below the monkey board without having any personnel standing on the rig floor where they would have been exposed to it.[91] And *three*, the only reason why Mr. Harrington decided to pull the drillstring up to 60-plus feet in the first place was the fear of it getting stuck again.[92] However, this fear was completely unjustified for two reasons. First, lowering the top drive mere 10-15 feet would have ***still*** put the bottomhole assembly 22-27 feet above where the top of the salt was

---

[86]    Exhibit 7, Deposition of Scotty Brubaker, pp. 51:12-52:1.

[87]    Exhibit 7, Deposition of Scotty Brubaker, pp. 49:1-50:10, pp. 52:22-53:25, pp. 96:25-97:4, and p. 99:13-18.

[88]    Exhibit 5, Deposition of Jason Parkman, pp. 114:22-115:13.

[89]    Exhibit 2, Deposition of Andy Cline, pp. 39:24-41:17; Exhibit 6, H&P corporate deposition, pp. 328:16-329:23; Exhibit 7, Deposition of Scotty Brubaker, pp. 131:20-132:3; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 47:10-48:19; Exhibit 13, Deposition of Stephen Walker, p. 27:6-14 and pp. 30:9-31:10; Rec. Doc. 134-11, Edward Ziegler's report, pp. 12-13 of 30.

[90]    Exhibit 1, W&T corporate deposition, pp. 45:24-47:9; Exhibit 11, Deposition of Tommy Bridges, pp. 71:19-72:18.

[91]    Exhibit 6, H&P corporate deposition, pp. 298:1-299:22; Exhibit 11, Deposition of Tommy Bridges, p. 73:11-16.

[92]    Exhibit 1, W&T corporate deposition, p. 56:2-13; Exhibit 6, H&P corporate deposition, pp. 299:23-300:17.

measured and about 46 feet above where the pipe was stuck[93]—making it unlikely that the pipe would get stuck again. And second, even in the unlikely event that the pipe were to get re-stuck, the next step would be to simply jar again.[94] The only issue there, of course, is that any additional jarring would eat away some time and would further delay W&T's drilling operations.[95]

Importantly, it is ***undisputed*** that lowering the top drive ***below*** the monkey board would have prevented this incident since Mr. Parkman's lanyard got caught on the finger that was ***leveled with*** the monkey board.[96] A number of witnesses readily conceded this point, including (1) W&T's corporate safety manager and corporate representative, Andy Cline,[97] (2) W&T SIMOPS tech for drilling and production operations, Willis Lee,[98] (3) H&P's corporate representative JT Dohm,[99] (4) H&P's driller, driller Tommy Bridges,[100] and (5) H&P's other roughneck/floor hand who was

---

[93]    Exhibit 1, W&T corporate deposition, p. 80:4-23 and p. 83:9-18; Exhibit 23, top drive position and salt location data.

[94]    Exhibit 1, W&T corporate deposition, p. 84:1-9; Exhibit 6, H&P corporate deposition, pp. 301:19-302:16; Exhibit 7, Deposition of Scotty Brubaker, pp. 33:15-34:6.

[95]    Exhibit 1, W&T corporate deposition, p. 84:1-9; Exhibit 7, Deposition of Scotty Brubaker, pp. 33:15-34:6 and p. 35:7-12.

[96]    Exhibit 4, Deposition of Keim Davis, pp. 119:20-121:25 and p. 122:12-22; Exhibit 5, Deposition of Jason Parkman, p. 178:20-23; Exhibit 6, H&P corporate deposition, p. 272:11-15 and pp. 305:21-306:23; Exhibit 9, Deposition of Robert Myers, Jr., p. 23:21-23; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 45:23-46:3; Exhibit 13, Deposition of Stephen Walker, pp. 94:25-95:17 and p. 80:3-7.

[97]    Exhibit 1, W&T corporate deposition, pp. 24:9-25:3; Exhibit 24, W&T corporate representative, Andy Cline's, deposition exhibit; Exhibit 2, Deposition of Andy Cline, pp. 39:24-42:8.

[98]    Exhibit 12, Deposition of Willis (Tot) Lee, pp. 49:11-50:11.

[99]    Exhibit 6, H&P corporate deposition, pp. 272:21-273:17.

[100]   Exhibit 11, Deposition of Tommy Bridges, p. 34:6-15, pp. 60:8-61:11, and p. 64:1-18.

hoisted with Mr. Parkman, Stephen Walker.[101] It is also uncontested that the decision ***not*** to lower the top drive below the monkey board was made—not by H&P—but by ***W&T***.[102] Therefore, trading a highly unlikely delay in resuming normal drilling operations in exchange with certainly eliminating the very hazard that caused Mr. Parkman's injuries—which, by the way, was the highest hazard on the rig at the time—should have been an easy call.[103] Yet, W&T decided against it.[104]

> **3.**   ***Engineering controls*: W&T does not request H&P to install auto-stop winches on its platform that could have prevented Mr. Parkman's injuries.**

As the third most effective way to eliminate or minimize hazards, the NIOSH hierarchy of control lists "engineering controls."[105] In fact, both the federal law and W&T's own policy required W&T to use engineering practices to reduce risks to the lowest level practicable.[106] And this is not just an empty letter on the paper, but a long-standing industry standard that W&T holds itself to.[107]

One of engineering controls that W&T could have used here to prevent Mr. Parkman's injury deals with the type of winches installed on its platform.[108] Specifically, the winch that Mr. Atkinson operated to hoist Mr. Parkman was a certified man-riding

---

[101]   Exhibit 13, Deposition of Stephen Walker, pp. 41:1-42:15 and pp. 46:14-47:4.

[102]   Exhibit 1, W&T corporate deposition, p. 52:10-20.

[103]   Exhibit 1, W&T corporate deposition, pp. 176:15-177:2; Exhibit 6, H&P corporate deposition, pp. 304:25-305:20.

[104]   Exhibit 6, H&P corporate deposition, pp. 307:21-308:5.

[105]   Exhibit 25, NIOSH hierarchy of controls.

[106]   CFR § 250.107 (a)(3). *See also* Exhibit 4, Deposition of Keim Davis, p. 102:8-23; Exhibit 6, H&P corporate deposition, pp. 251:9-252:13, p. 253:5-13, and p. 254:9-16; Exhibit 15, W&T fall protection procedure at WT 000256-57.

[107]   Exhibit 1**,** W&T corporate deposition, pp. 158:15-159:4 and pp. 160:24-161:22.

[108]   Exhibit 7, Deposition of Scotty Brubaker, p. 132:4-15; Exhibit 1, W&T corporate deposition, p. 214:22-25.

winch (that can be used for other purposes as well). However, just like its competitors who had already done so,[109] W&T could have—under its contract with H&P—requested H&P to install a dedicated man-riding winch with the overpull technology.[110] With its overpull feature, such a winch—unlike the one at issue here[111]—would have automatically shut itself off as soon as Mr. Parkman's lanyard got snugged on a monkey board finger.[112] In turn, this would have immediately eliminated the force that pulled Mr. Parkman's body in the opposite direction and would have prevented his injury.[113]

But, in addition to requesting them, W&T also had to pay H&P to install these auto-stop winches on its platform.[114] And had W&T done so, H&P would have to install them without an issue.[115]

### 4. *Administrative controls*: In violation of its own policy, W&T does not sign off on the JSA and allows the job to proceed.

As the least efficient way to eliminate or mitigate job-related hazards, out of those pertinent to this case, the NIOSH hierarchy of controls lists administrative controls.[116] An

---

[109]  Exhibit 6, H&P corporate deposition, pp. 330:3-331:16.

[110]  Exhibit 4, Deposition of Keim Davis, pp. 114:6-115:4 and pp. 116:8-117:4; Exhibit 22, H&P personnel hoisting/manriding policy, para. 39.8.

[111]  Exhibit 4, Deposition of Keim Davis, p. 118:11-25.

[112]  Exhibit 6, H&P corporate deposition, p. 49:2-25

[113]  Exhibit 4, Deposition of Keim Davis, pp. 119:20-121:25 and p. 122:12-22; Exhibit 6, H&P corporate deposition, p. 49:2-25; Exhibit 7, Deposition of Scotty Brubaker, p. 129:4-13.

[114]  Exhibit 1, W&T corporate deposition, p. 212:16-213:7; Exhibit 6, H&P corporate deposition, pp. 330:3-331:16.

[115]  Exhibit 4, Deposition of Keim Davis, pp. 116:8-117:4 and p. 119:6-11; Exhibit 6, H&P corporate deposition, 330:3-331:16.

[116]  Exhibit 25, NIOSH hierarchy of controls.

example of an administrative control would be a JSA.[117] A JSA lists all of the steps involved in a particular task, outlines the hazards involved with each specific step, and then discusses the ways in which those hazards could be mitigated.[118] Here, H&P had two JSAs: A pre-tour JSA that provided a general blueprint for the work to be done during the shift,[119] and a job-specific JSA that addressed the personnel hoisting operation.[120] To be clear, a job-specific JSA was **_required_** for the hoisting operation[121]—both under H&P and W&T's policies.[122]

But although conducted by H&P, the JSA job planning phase was H&P and W&T's **_joint_** responsibility.[123] In truth, as the operator, W&T is not allowed to just pencil-whip the JSAs.[124] Instead, the federal law requires W&T to understand the job at hand and its hazards **_equally_** as H&P, to weigh in on the potential risks, and to allow the

---

[117]    Exhibit 7, Deposition of Scotty Brubaker, p. 132:16-25.

[118]    Exhibit 4, Deposition of Keim Davis, pp. 82:11-13 and pp. 85:18-86:20; Exhibit 7, Deposition of Scotty Brubaker, p. 69:4-17; Exhibit 11, Deposition of Tommy Bridges, pp. 99:25-101:5.

[119]    Exhibit 5, Deposition of Jason Parkman, pp. 36:21-38:13; Exhibit 9, Deposition of Robert Myers, Jr., pp. 36:12-37:17; Exhibit 19, H&P general pre-tour JSA.

[120]    Exhibit 5, Deposition of Jason Parkman, pp. 38:25-39:13; Exhibit 8, Deposition of Ralph Stevens, Jr., p. 17:16-22; Exhibit 11, Deposition of Tommy Bridges, pp. 15:14-16:11 and p. 17:1-11; Exhibit 18, H&P job-specific JSA.

[121]    Exhibit 1, W&T corporate deposition, p. 182:5-11; Exhibit 4, Deposition of Keim Davis, pp. 90:19-91:9.

[122]    Exhibit 7, Deposition of Scotty Brubaker, p. 64:1-5; Exhibit 11, Deposition of Tommy Bridges, p. 80:14-18; Exhibit 14, W&T JSA policy at WT000272.

[123]    Exhibit 1, W&T corporate deposition, p. 139:14-25; Exhibit 12, Deposition of Willis (Tot) Lee, p. 30:14-22; Exhibit 4, Deposition of Keim Davis, pp. 93:17-95:1; Exhibit 6, H&P corporate deposition, p. 46:11-25, p. 179:16-19, and p. 327:8-14; Exhibit 13, Deposition of Stephen Walker, pp. 42:16-45:6; Rec. Doc. 135-6, Eugene Sweeney's report, pp. 11-12 of 25.

[124]    Exhibit 4, Deposition of Keim Davis, p. 88:2-22; Exhibit 7, Deposition of Scotty Brubaker, pp. 65:21-66:4 and p. 67:11-16; Exhibit 12, Deposition of Willis (Tot) Lee, p. 31:5-25.

job to proceed only upon being satisfied that it can be performed safely[125]—especially when it is as hazardous as it was here.[126] In other words, to the extent that a JSA was in any way deficient, the fault therefor would fall both on H&P ***and*** W&T.[127]

Here, the secondary fall protection system used by Mr. Parkman at the time of the incident was, as noted, a static line. Another example of a secondary fall protection system would be a self-retracting line or an "SRL." But, while they serve the same function and are both used in the offshore industry, static lines and SRLs have different features.[128] The JSA on the day of the incident addressed the SRL and not the static line.[129] Two points are worth noting here.

*One*, the evidence shows that—in addition to H&P—W&T also bears the responsibility for a deficient JSA.[130]  So, to the extent that W&T argues that the JSA at issue was flawed, it—too—is to blame for it.

---

[125]   Exhibit 4, Deposition of Keim Davis, p. 88:2-22, p. 94:13-19, and p. 102:8-23; Exhibit 5, Deposition of Jason Parkman, pp. 40:8-42:4 and p. 105:2-12; Exhibit 6, H&P corporate deposition, pp. 289:17-290:18 and pp. 293:4-17; Exhibit 7, Deposition of Scotty Brubaker, p. 67:1-6, p. 68:4-23, and pp. 69:18-70:8; Exhibit 10, Deposition of Ronnie Atkinson, p. 79:1-5; Exhibit 11, Deposition of Tommy Bridges, pp. 85:2-88:23; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 32:1-33:, pp. 34:17-35:11, p. 36:12-18, and pp. 61:16-63:4.

[126]   Exhibit 4, Deposition of Keim Davis, p. 107:12-17; Exhibit 12, Deposition of Willis (Tot) Lee, p. 33:18-24.

[127]   Exhibit 4, Deposition of Keim Davis, pp 93:17-95:1 and p. 104:2-25; Exhibit 5, Deposition of Jason Parkman, pp. 201:23-202:22; Exhibit 7, Deposition of Scotty Brubaker, pp. 133:25-135:13; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 55:13-56:15; Exhibit 13, Deposition of Stephen Walker, pp. 42:16-45:6.

[128]   Exhibit 4, Deposition of Keim Davis, pp. 56:9-57:8 and pp. 130:11-131:6; Exhibit 6, H&P corporate deposition, pp. 86:23-87:17 and pp. 118:2-119:12

[129]   Exhibit 1, W&T corporate deposition, pp. 144:14-145:7; Exhibit 5, Deposition of Jason Parkman, pp. 122:21-123:22.

[130]   Exhibit 4, Deposition of Keim Davis, pp 93:17-95:1 and p. 104:2-25; Exhibit 5, Deposition of Jason Parkman, pp. 201:23-202:22; Exhibit 7, Deposition of Scotty

And *two*, both federal law and W&T's own policies and procedures required W&T's supervisor to sign off on "all JSAs" before allowing the job to proceed.[131] Here, while there is conflicting evidence on whether Mr. Brubaker was actually present during the JSA meetings,[132] one thing is certain: Mr. Brubaker—W&T's company man on duty at the time—did ***not*** sign the two JSAs in question.[133] Why? Because W&T never trained him to do so.[134] And, as a result, Mr. Brubaker did not even know that he was required to do it.[135] Indeed, it was the first time during his deposition that Mr. Brubaker learned that he was required, both under federal law and W&T's own policies and procedures, to sign

---

Brubaker, pp. 133:25-135:13; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 55:13-56:15; Exhibit 13, Deposition of Stephen Walker, pp. 42:16-45:6.

[131]  Exhibit 1, W&T corporate deposition, p. 162:17-20 and pp. 215:9-217:21; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 30:23-31:4 and pp. 37:4-39:14; Exhibit 14, W&T JSA policy at WT000273; Exhibit 4, Deposition of Keim Davis, pp. 86:21-87:25 and pp. 91:19-92:11; Exhibit 6, H&P corporate deposition, p. 153:4-9, p. 241:7-9, p. 282:6-13, pp. 284:25-286:23; Exhibit 13, Deposition of Stephen Walker, p. 36:12-17; CFR §250.1911(b)(2)-(3) ("(2) The immediate supervisor of the crew performing the job onsite must conduct the JSA, sign the JSA, and ensure that all personnel participating in the job understand and sign the JSA. (3) The individual you designate as being in charge of the facility must approve and sign all JSAs before personnel start the job."); Rec. Doc. 135-6, Eugene Sweeney's report, pp. 7-8 of 25.

[132]  Compare, e.g., Exhibit 5, Deposition of Jason Parkman, pp. 53:5-54:6, pp. 55:18-56:5, and p. 104:10-13 and Exhibit 10, Deposition of Ronnie Atkinson, pp. 32:23-33:20, p. 55:10-17, and p. 79:10-13, Exhibit 11, Deposition of Tommy Bridges, p. 91:9-18 and pp. 105:13-106:5 with Exhibit 7, Deposition of Scotty Brubaker, pp. 98:16-99:10.

[133]  Exhibit 1, W&T corporate deposition, p. 105:20-25, pp. 109:22-110:1, and p. 188:19-23 Exhibit 2, Deposition of Andy Cline, pp. 23:20-24:2; Exhibit 4, Deposition of Keim Davis, p. 92:12-22 and pp. 105:11-106:8; Exhibit 5, Deposition of Jason Parkman, pp. 112:22-113:9; Exhibit 6, H&P corporate deposition, p. 177:12-21 and p. 294:4-8; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 58:7-60:11; Exhibit 13, Deposition of Stephen Walker, pp. 37:21-38:15; Rec. Doc. 135-6, Eugene Sweeney's report, p. 8 of 25.

[134]  Exhibit 7, Deposition of Scotty Brubaker*, pp. 60:4-61:5, p. 63:17-24, and pp. 125:23-126:22. *See also* Exhibit 7, Deposition of Scotty Brubaker, p. 29:12-17, p. 37:22-38:12, and p. 71:20-23. And neither did AGR. *See id.* at pp. 81:21-82:1 and pp. 82:2-84:20.

[135]  Exhibit 7, Deposition of Scotty Brubaker, p. 66:4-25.

off on all JSAs on W&T's platform.[136] So, not only did Mr. Brubaker not sign the JSAs that concerned the hoisting operation that caused Mr. Parkman's injuries, but he did not sign *any* JSAs before allowing jobs to proceed[137]—making it only a matter of time that an incident such as this one would happen.[138]

> **E.    Contrary to W&T's argument, the evidence rules out the lack of a flagger and the static line being tied off as causes of this incident.**

Shortly after this incident, W&T, H&P, and the Bureau of Safety and Environmental Enforcement ("BSEE") all conducted their respective investigations into the events of August 25, 2018.  But a formidable body of evidence gathered throughout the course of this litigation has disproven their conclusions.

> **1.    A lack of designated flagger did not play a role in this incident.**

The BSEE concluded that the line of sight of Mr. Atkinson, H&P's toolpusher who operated the winch that hoisted Mr. Parkman, was obstructed by the drill pipes racked vertically in the derrick.[139] This led the BSEE to find that Mr. Atkinson should have used a flagger to serve as an additional pair of eyes observing the lift.[140] The evidence, however, disagrees.

According to H&P's policy, a flagger should be used only when the line of sight of the person operating the winch is obstructed.[141] But from the very day of the incident,

---

[136]    Exhibit 7, Deposition of Scotty Brubaker, p. 62:5-11, p. 65:1-18, p. 79:7-14, and p. 70:15-23.

[137]    Exhibit 7, Deposition of Scotty Brubaker, pp. 67:19-68:1.

[138]    Exhibit 6, H&P corporate deposition, pp. 290:19-291:4.

[139]    Rec. Doc. 143-24, the BSEE incident report, p. 3 of 4.

[140]    Exhibit 6, H&P corporate deposition, pp. 345:22-346:13.

[141]    Exhibit 6, H&P corporate deposition, p. 60:20-25, p. 83:21-23, and p. 171:14-18.

Mr. Atkinson has maintained that his line of sight was not, at all, obstructed[142] and that he, therefore, did not need a flagger.[143] Mr. Atkinson attributed the BSEE's flawed finding to the fact that there were fewer pipes racked up on the platform on the day of the incident than on the day when the BSEE arrived to the platform to conduct its investigation.[144] And, besides Mr. Atkinson's own testimony, four additional groups of evidence undermine the BSEE's conclusion.

*One*, W&T's corporate safety manager and corporate representative, Andy Cline—who conducted W&T's investigation into this incident—specifically found that Mr. Atkinson's line of sight did *not* contribute to this incident.[145] This was also the conclusion of H&P's investigation.[146]

*Two*, Tommy Bridges, H&P's driller, operated the same winch to bring Mr. Parkman down to the ground only a few minutes after the incident.[147] And Mr. Bridges testified that (1) he had no issues seeing Mr. Parkman all the way up, and (2) having a flagger would not have made any difference here.[148]

---

[142]    Exhibit 10, Deposition of Ronnie Atkinson, pp. 12:24-14:8 and pp. 38:20-40:25.

[143]    Exhibit 10, Deposition of Ronnie Atkinson, p. 71:12-23.

[144]    Exhibit 10, Deposition of Ronnie Atkinson, pp. 47:17-50:4 and pp. 52:4-54:13; Exhibit 6, H&P corporate deposition, p. 98:6-22; Exhibit 13, Deposition of Stephen Walker, pp. 21:16-22:7; Rec. Doc. 135-6, Eugene Sweeney's report, pp. 8-9 of 25.

[145]    Exhibit 1, W&T corporate deposition, pp. 145:13-146:17. *See also* Exhibit 2, Deposition of Andy Cline, pp. 66:1-67:19 and p. 72:13-23.

[146]    Exhibit 6, H&P corporate deposition, p. 316:19-23.

[147]    Exhibit 11, Deposition of Tommy Bridges, pp. 36:10-38:24.

[148]    *Id.*

*Three*, almost the entire H&P crew testified that Mr. Atkinson's line of sight was clear, thereby eliminating the need to designate a flagger.[149]

And *four*, Stephen Walker testified that he used the same side of the winch many times before the incident—even with the same number of pipes in the rack—and never had a line-of-sight problem.[150] In fact, there is ***no evidence***—documentary or testimonial—that Mr. Atkinson operated the winch carelessly or that he did not immediately turn the winch off upon noticing the incident.[151] To the contrary. The evidence shows that Mr. Atkinson (1) purposefully slowed down when lifting Mr. Parkman through the tight quarters in the derrick created by W&T's decisions,[152] and (2) stopped the winch as soon as he saw Mr. Parkman flailing.[153]

### 2.    A lack of radio did not play a role in this incident.

It is undisputed that Mr. Parkman did not have a handheld radio on him at the time of the hoisting operation.[154] However, it is also undisputed that the lack of a radio did not, and could not, have contributed to this incident. This is so because (1) the incident happened so quickly that Mr. Parkman would have admittedly been unable to

---

[149]    Exhibit 13, Deposition of Stephen Walker, pp. 45:7-46:3, p. 62:5-25, and p. 99:13-25; Exhibit 4, Deposition of Keim Davis, p. 46:15-22, pp. 111:16-113:12, and pp. 147:4-148:16; Exhibit 6, H&P corporate deposition, pp. 56:19-57:18 and pp. 187:23-188:4; Exhibit 8, Deposition of Ralph Steven, Jr., p. 54:6-15 and p. 55:6-13.

[150]    Exhibit 13, Deposition of Stephen Walker, pp. 62:5-25.

[151]    Exhibit 1, W&T corporate deposition, pp. 97:5-98:1, p. 127:10-22, and pp. 145:13-146:17; Exhibit 4, Deposition of Keim Davis, pp. 111:6-113:12 and pp. 147:4-148:16; Exhibit 6, H&P corporate deposition, pp. 317:17-318:22.

[152]    Exhibit 5, Deposition of Jason Parkman, p. 119:1-17; Exhibit 20, Ronnie Atkinson's statement; Exhibit 10, Deposition of Ronnie Atkinson, pp. 35:23-38:19 and pp. 41:13-42:2. Exhibit 1, W&T corporate deposition, p. 101:5-16.

[153]    Exhibit 6, H&P corporate deposition, p. 64:22-24; Exhibit 10, Deposition of Ronnie Atkinson, pp. 14:1-15:19.

[154]    Exhibit 5, Deposition of Jason Parkman, pp. 102:23-104:3.

use a radio with both of his hands to signal for help, and (2) signaling with his hands was faster than using a radio would have been.[155]

### 3.    The issue with the static line further reveals just how W&T's (in)actions contributed to this incident.

In their investigations, H&P and W&T found that Mr. Parkman's static line was still tied off to the handrail on the monkey board, pulling him closer to the finger where his lanyard got caught.[156] But there are five issues with this theory.

*First*, the evidence on whether the static line was actually tied off at the time of the incident is contradictory, at best. For instance, W&T's own company man, Mr. Harrington, testified that—a few minutes following the incident when he got to the rig—he saw that the static line was hanging down and was ***not*** tied off.[157] In other words, Mr. Harrington testified that the state of the static line was not the same <u>moments</u> after the incident and as shown on the photographs taken a <u>few days</u> after the incident.[158] Mr. Bridges, HP's driller, also recalled that the static line was not tied off at the time.[159]

*Second*, that notwithstanding, even if the static line was tied off to the monkey board's handrail, this was only problematic because Mr. Parkman's was being lifted ***above*** the monkey board.[160] In other words, had W&T lowered the top drive below the

---

[155]    Exhibit 5, Deposition of Jason Parkman, pp. 102:23-104:3; Exhibit 6, H&P corporate deposition, pp. 319:18-320:11; Exhibit 11, Deposition of Tommy Bridges, pp. 159:8-161:15; Exhibit 13, Deposition of Stephen Walker, pp. 100:23-101:20.

[156]    Exhibit 16, W&T investigation report, p. 3; Exhibit 17, H&P investigation report, p. 6.

[157]    Exhibit 3, Deposition of Atlas Harrington, pp. 94:3-99:15, p. 101:10-17, pp. 102:1-105:21, pp. 109:24-113:12, and pp. 116:5-117:21.

[158]    *Id. See also* Exhibit 8, Deposition of Ralph Stevens, Jr., pp. 59:10-60:6.

[159]    Exhibit 11, Deposition of Tommy Bridges, pp. 43:11-44:21.

[160]    Exhibit 1, W&T corporate deposition, pp. 144:14-145:18, p. 147:10-20, and pp. 149:15-150:2.

monkey board—as H&P had requested—the fact that the static line was still tied off would have been irrelevant.[161] No one explained this better than W&T's own corporate representative, Andy Cline:

> Q: If Mr. Parkman only had to be lifted, you know, *even five feet under the monkey board*, then, like you said, you may have missed it with having that static line tied off, *but it's not going to cause the incident, fair*?
>
> A: *The incident may not have happened at all*.[162]
>
> . . .
>
> Q: Statement is: "*If Mr. Parkman did not have to be lifted past the level of the monkey board, this incident would not have occurred*." Do you see that?
>
> A: Uh-huh.
>
> Q: You understand this statement?
>
> A: I do.
>
> Q: And then I give you zero to 10: Zero, strongly disagree; *10, strongly agree*. I assume you're familiar with that type of thing, right?
>
> A: Uh-huh.
>
> Q: Where do you fall as W&T's corporate rep?
>
> A: If he had not been lifted to the monkey board, he could [not] have impacted it. *So we'll have to go with a 10 on that*.[163]

---

[161] Exhibit 1, W&T corporate deposition, pp. 149:15-150:2 and p. 244:1-23; Exhibit 4, Deposition of Keim Davis, pp. 95:18-96:13; Exhibit 6, H&P corporate deposition, p. 168:5-9 and pp. 340:19-341:9; Exhibit 7, Deposition of Scotty Brubaker, pp. 129:17-130:15; Exhibit 13, Deposition of Stephen Walker, pp. 95:20-96:13.

[162] Exhibit 1, W&T corporate deposition, pp. 245:24-245:4 (emphasis added).

[163] Exhibit 1, W&T corporate deposition, pp. 248:24-249:13; *id.* at p. 247:10-24.



And, again, the decision (1) to park the top drive above the monkey board,[165] and (2) not to lower the top drive below the monkey board was made by **_W&T_**.[166]

*Third,* relatedly, W&T's decision to position the top drive partly below and partly above the monkey board made the static line's position dangerous **_regardless_** of its state.[167] Indeed, had the static line been tied off at the monkey board, it would have pulled Mr. Parkman towards the fingers where his lanyard could have been, and was ultimately, caught.[168] But had the static line been released, it would have been hanging towards the middle of the derrick—pulling Mr. Parkman towards the top drive and other

---

[164]    Exhibit 24, W&T corporate representative, Andy Cline's, deposition exhibit.

[165]    Exhibit 1, W&T corporate deposition, p. 44:4-9 and pp. 165:16-166:11; Exhibit 7, Deposition of Scotty Brubaker, p. 29:12-17, pp. 39:21-40:5, p. 42:20-25, p. 91:9-23, and pp. 124:14-125:15; Exhibit 3, Deposition of Atlas Harrington, p. 51:13-23, p. 73:21-25, pp. 79:19-80:2, and p. 84:18-24; Exhibit 4, Deposition of Keim Davis, p. 79:2-14 and p. 96:14-16; Exhibit 6, H&P corporate deposition, p. 266:5-21, p. 274:18-275:17, and p. 304:19-24; Exhibit 10, Deposition of Ronnie Atkinson, p. 23:3-16 and p. 30:9-21; Exhibit 11, Deposition of Tommy Bridges, pp. 23:5-24:12, pp. 28:19-29:2p. 31:3-13, pp. 61:15-62:3, p. 153:16-1, and p. 154:15-25; Exhibit 13, Deposition of Stephen Walker, pp. 13:2-15:15 and pp. 50:18-51:10.

[166]    Exhibit 5, Deposition of Jason Parkman, pp. 42:5-43:10, pp. 57:17-59:23, p. 63:1-13, and p. 151:13-22; Exhibit 7, Deposition of Scotty Brubaker, pp. 49:1-50:10, pp. 52:22-53:25, pp. 96:25-97:4, and p. 99:13-18.

[167]    Exhibit 4, Deposition of Keim Davis, pp. 77:4-78:25.

[168]    *Id.*; Exhibit 13, Deposition of Stephen Walker, p. 97:11-20 and p. 102:11-15.

drilling equipment.[169] In fact, the sole reason why H&P would tie the static line off in the first place would be to keep it from getting entangled during drilling operations.[170]

*Fourth*, the state of the static line would have been apparent to anyone who bothered to check it during the JSA—including W&T's company man, Mr. Brubaker.[171] Had Mr. Brubaker done what W&T's own policies and procedures as well as the federal law required him to do and had he thoroughly reviewed the JSA before allowing the job to proceed, he would have been able to see whether the static line was tied off.[172] So, to the extent that W&T finds this to be a cause of the incident, it is one of its own making.

And *fifth*, had W&T requested and paid H&P to install a dedicated auto-stop winch with the overpull mechanism on its platform, the fact that the static line was tied off at the monkey board would have made no difference. This is so because the dedicated man-riding winch, as opposed to the certified one used on the day in question, would have automatically stopped the forces that were pulling Mr. Parkman's body in the opposite directions.[173]

---

[169]    Exhibit 4, Deposition of Keim Davis, pp. 77:4-78:25.

[170]    Exhibit 5, Deposition of Jason Parkman, pp. 120:22-121:17 and p. 122:17-20; Exhibit 6, H&P corporate deposition, p. 324:4-16; Exhibit 10, Deposition of Ronnie Atkinson, pp. 62:21-63:1.

[171]    Exhibit 1, W&T corporate deposition, p. 144:14-145:7; Exhibit 10, Deposition of Ronnie Atkinson, p. 77:3-21; Exhibit 11, Deposition of Tommy Bridges, pp. 40:19-42:12 and p. 77:4-20.

[172]    Exhibit 3, Deposition of Atlas Harrington, pp. 113:23-115:1; Exhibit 6, H&P corporate deposition, pp. 131:25-132:10 and p. 134:2-14.

[173]    Exhibit 7, Deposition of Scotty Brubaker, p. 129:4-13.

In sum, the record is replete with evidence showing exactly how W&T's (in)actions caused Mr. Parkman's injuries. Ultimately, the W&T was cited by the BSEE for the incident.[174]

## III.   LAW AND ARGUMENT

### A.    Summary judgment is proper only if there are no disputed facts.

The summary judgment standard is well-settled. The burden on a summary judgment is on the movant to show that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law.[175] The procedure tests simply for the existence, not the extent, of these genuine disputes.[176] This means that where the trial court, in order to grant summary judgment, must overlook material in the record that raises a genuine dispute as to the facts underlying the movant's right to judgment, summary judgment is not proper.[177] And "[i]f the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."[178]

Also relevant here, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor."[179] And "[e]ven if

---

[174]  Exhibit 2, Deposition of Andy Cline, p. 51:21-23; Exhibit 6, H&P corporate deposition, p. 256:2-7; Exhibit 26, BSEE's INC issued to W&T.

[175]  Fed. R. Civ. P. 56(a); *see also Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994).

[176]  *Credeur v. Louisiana Through Off. of Att'y Gen.,* 860 F.3d 785 (5th Cir. 2017).

[177]  *Smith v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist.,* 372 F. Supp. 3d 431, 438 (E.D. La. 2019).

[178]  *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994).

[179]  *Singleton v. Fieldwood Energy, LLC,* 2016 WL 3902599, at *2 (E.D. La. 2016) (internal citations omitted).

30

the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'the better course would be to proceed to a full trial.'"[180]

### B.    Genuine issues of material fact permeate W&T's motion; consequently, summary judgment is improper.

To frame the issues, the plaintiff admits that the contractual relationship between W&T and H&P was that of an independent contractor. However, Louisiana law—which applies here—still imposes vicarious liability on W&T due to its exercise of operational control over the task that led to Mr. Parkman's injuries and its authorization of unsafe work practices on its platform.[181] But vicarious liability notwithstanding, the record evidence shows that W&T was also independently negligent in causing this incident[182] —thereby dooming its summary judgment attempt entirely.

#### 1.    Genuine factual issues exist as to whether W&T exercised operational control over H&P's.

A principal in Louisiana is vicariously liable for the negligent acts of its independent contractor if the principal exercised some "operational control" over the contractor's actions.[183] Said another way, the principal is vicariously liable when it retains the right of supervising the contractor's work in a way that deprives the contractor of a ***complete freedom*** to perform that work as it pleases:

> In order for a principal to be liable for the actions of an independent contractor, the [principal] must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to

---

[180]    *Id.* (internal citations omitted).

[181]    *Villaronga v. Gelpi P'ship No. 3,* 536 So. 2d 1307, 1310 (La. App 1st Cir. 1988).

[182]    *Graham v. Amoco Oil Co.,* 21 F.3d 643, 645 (5th Cir. 1994); *Echeverry v. Jazz Casino Co., L.L.C.,* 988 F.3d 221, 228 (5th Cir. 2021).

[183]    *Id.*

> inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations or deviations. Such a general right is usually reserved to employers, but this does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of right of supervision that the contractor ***is not entirely free*** to do the work in his own way.[184]

Ultimately, operational control exists if the principal "has direct supervision over the step-by-step process of accomplishing the work that the contractor is not entirely free to do the work in his own way."[185] The record in this case is brimming with evidence that shows just how—and why—W&T exercised operational control over H&P's step-by-step hoisting operation.

As a preliminary matter, it should be noted that H&P had control over how to conduct its post-jarring top drive and derrick inspection. But Mr. Parkman was not injured while performing the post-jarring inspection. Indeed, Mr. Parkman never got a chance to conduct the inspection because he was injured while ***still being lifted*** into the position from which to perform it.[186] And the control over this lifting operation in the course of which Mr. Parkman was injured rested entirely in the hands of W&T. This control was evident in four ways.

---

[184]    *Dixon v. Danos & Curole Marine Contractors, Inc.*, 1998 WL 812393, at *2 (E.D. La. 1998) (citing *Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471 (5th Cir. 1989)) (emphasis added).

[185]    *Renwick v. PNK Lake Charles, L.L.C.,* 901 F.3d 605, 613 (5th Cir. 2018).

[186]    Exhibit 6, H&P corporate deposition, p. 308:7-11; Exhibit 13, Deposition of Stephen Walker, p. 87:9-20.

*First*, it was W&T's day company man, Atlas Harrington, who decided to pull the freed drillstring up 60-plus feet above the rig floor.[187] That is, Mr. Harrington decided to stop the top drive approximately 60-plus feet off the rig floor.[188] This, in turn, required H&P to inspect the top drive—not as it is usually done as close to the rig floor as possible[189]—but at a significant height. To be sure, it is undisputed that the decision on where and how to position the top drive was made by W&T.[190] And this decision made the lifting operation incredibly dangerous for because—by virtue of being pyramidal—the derrick gets narrower with height and has more components on which one could get caught up.[191]

---

[187]  Exhibit 1, W&T corporate deposition, pp. 73:6-74:8 and p. 75:18-25; Exhibit 23, top drive position and salt location data.

[188]  Exhibit 3, Deposition of Atlas Harrington, p. 35:6-22; Exhibit 5, Deposition of Jason Parkman, p. 183:19-24; Exhibit 6, H&P corporate deposition, p. 137:15-18 and p. 261:6-24; Exhibit 7, Deposition of Scotty Brubaker, p. 92:4-8; Exhibit 27, Deposition sketch by Tommy Bridges.

[189]  Exhibit 4, Deposition of Keim Davis, pp. 74:19-75:4; Exhibit 5, Deposition of Jason Parkman, pp. 83:3-84:21; Exhibit 13, Deposition of Stephen Walker, pp. 48:22-49:24.

[190]  Exhibit 1, W&T corporate deposition, p. 44:4-9 and pp. 165:16-166:11; Exhibit 7, Deposition of Scotty Brubaker, p. 29:12-17, pp. 39:21-40:5, p. 42:20-25, p. 91:9-23, and pp. 124:14-125:15; Exhibit 3, Deposition of Atlas Harrington, p. 51:13-23, p. 73:21-25, pp. 79:19-80:2, and p. 84:18-24; Exhibit 4, Deposition of Keim Davis, p. 79:2-14 and p. 96:14-16; Exhibit 6, H&P corporate deposition, p. 266:5-21, p. 274:18-275:17, and p. 304:19-24; Exhibit 10, Deposition of Ronnie Atkinson, p. 23:3-16 and p. 30:9-21; Exhibit 11, Deposition of Tommy Bridges, pp. 23:5-24:12, pp. 28:19-29:2p. 31:3-13, pp. 61:15-62:3, p. 153:16-1, and p. 154:15-25; Exhibit 13, Deposition of Stephen Walker, pp. 13:2-15:15 and pp. 50:18-51:10; Rec. Doc. 134-11, Edward Ziegler's report, p. 11 of 30, para. 1.19.

[191]  Exhibit 5, Deposition of Jason Parkman, pp. 152:1-153:6; Exhibit 6, H&P corporate deposition, pp. 270:21-271:21; Exhibit 10, Deposition of Ronnie Atkinson, pp. 31:25-32:6; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 48:25-49:14.

*Second,* W&T decided to park the top drive—not only at an unsafe height—but also in an unsafe position, *i.e., **partly above and partly below*** the monkey board.[192] By positioning the top drive in this way, W&T created a "tight gap" between the monkey board and its fingers, on one hand, and a 15-foot wide top drive,[193] on the other, through which one had to be lifted to be able to conduct a post-jarring inspection.[194] And it is exactly in this tight gap, at the monkey board level, that Mr. Parkman's lanyard got snugged.[195]

*Third*, the evidence shows that W&T did not have to position the top drive in a way that made the post-jarring inspection—which W&T knew would have to be conducted way ahead of time[196]—inherently dangerous. In fact, W&T had a duty under federal law to either eliminate the need for hoisting Mr. Parkman or, at the very least, to reduce the height to which he had to be lifted.[197] And W&T could have easily done so by

---

[192]   Exhibit 1, W&T corporate deposition, p. 19:1-7; Exhibit 4, Deposition of Keim Davis, pp. 75:6-76:5; Exhibit 6, H&P corporate deposition, p. 263:3-16; Exhibit 7, Deposition of Scotty Brubaker, p. 52:3-10; Exhibit 10, Deposition of Ronnie Atkinson, p. 21:3-14.

[193]   Exhibit 1, W&T corporate deposition, p. 146:17.

[194]   Exhibit 1, W&T corporate deposition, pp. 21:18-22:11; Exhibit 4, Deposition of Keim Davis, pp. 75:6-76:5; Exhibit 6, H&P corporate deposition, p. 236:15-24 and pp. 271:22-272:6; Exhibit 13, Deposition of Stephen Walker, p. 97:21-25.

[195]   Exhibit 4, Deposition of Keim Davis, pp. 119:20-121:25 and p. 122:12-22; Exhibit 5, Deposition of Jason Parkman, p. 178:20-23; Exhibit 6, H&P corporate deposition, p. 272:11-15 and pp. 305:21-306:23; Exhibit 9, Deposition of Robert Myers, Jr., p. 23:21-23; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 45:23-46:3; Exhibit 13, Deposition of Stephen Walker, pp. 94:25-95:17 and p. 80:3-7.

[196]   Exhibit 1, W&T corporate deposition, pp. 172:2-173:6; Exhibit 3, Deposition of Atlas Harrington, pp. 82:16-84:3; Exhibit 4, Deposition of Keim Davis, pp. 79:22-82:4; Exhibit 6, H&P corporate deposition, p. 268:2-16; Exhibit 7, Deposition of Scotty Brubaker, p. 35:13-24 and p. 40:13-18.

[197]   CFR § 250.107(a)(3). *See also* Exhibit 1, W&T corporate deposition, pp. 150:14-151:11; Exhibit 6, H&P corporate deposition, pp. 294:23-295:10 and pp. 256:23-259:18; Exhibit 25, NIOSH hierarchy of controls; Exhibit 7, Deposition of Scotty Brubaker, pp. 130:22-131:19; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 40:15-44:22 and p. 54:9-25.

breaking out a triple or, as H&P had asked it to do, lower the top drive mere 10-15 feet to bring it entirely below the monkey board where the risk of getting caught up was incomparably lower. Each option will be discussed in turn.

One, had it decided to break out a triple,[198] W&T would have (1) raised the whole stand, all three joints of pipe, at **90 feet** off the rig floor, (2) disconnected it from the rest of the drillstring and racked it back in the derrick, and (3) lowered the top drive **all the way to the floor** to connect it to the next piece of pipe in the hole.[199] In doing so, W&T would have eliminated (1) the need to hoist Mr. Parkman as the inspection could have been done on a ladder,[200] (2) the risk of having the drillstring stuck again because—by being raised 30 feet higher off the rig floor—the drillstring was less likely to get re-stuck,[201] and (3) the need to engage in "weird" acts since the rig was naturally designed for triples and breaking three joints of pipe would have been easier.[202] And to bring it full circle, no competing risk involved with breaking out a triple outweighed the looming risk of injury. Indeed, while some components may have arguably gotten loose during jarring,[203] that was highly unlikely considering that the top drive was already being moved up and down during the post-jarring circulating process[204] and no objects had

---

[198]    Exhibit 3, Deposition of Atlas Harrington, p. 46:2-11 and p. 60:21-24.

[199]    Exhibit 3, Deposition of Atlas Harrington, pp. 65:6-67:4 and pp. 67:23-69:11; Exhibit 13, Deposition of Stephen Walker, pp. 31:11-32:17 and pp. 46:14-47:22.

[200]    Exhibit 3, Deposition of Atlas Harrington, pp. 67:23-69:11; Exhibit 5, Deposition of Jason Parkman, pp. 115:14-117:15.

[201]    Exhibit 3, Deposition of Atlas Harrington, pp. 61:25-62:17, p. 63:6-22, and p. 67:9-22.

[202]    Exhibit 11, Deposition of Tommy Bridges, p. 29:12-21.

[203]    Exhibit 6, H&P corporate deposition, p. 308:13-19, p. 309:16-25, and pp. 313:22-314:4.

[204]    Exhibit 10, Deposition of Ronnie Atkinson, pp. 23:21-24:1; Exhibit 11, Deposition of Tommy Bridges, pp. 64:19-65:23, pp. 66:4-68:2, and p. 71:9-12.

fallen down to the rig.[205] So, in truth, the only disadvantage with breaking out a triple and completely eliminating the need to lift Mr. Parkman up to 90 feet off the rig floor was the additional time that it would have taken W&T to resume its normal drilling operations.[206]

And two, even if hoisting could not have been entirely avoided—which is denied—W&T was required to try to reduce the height of the lift.[207] W&T could have achieved that lowering the top drive mere 10-15 feet in order to bring it fully below the monkey board. In fact, exercising its stop work authority,[208] H&P crew specifically asked W&T to allow them to do so.[209] But W&T's other company man, Scotty Brubaker, in its exercise of control over the operation admittedly "overruled" H&P's request.[210]  In light of Mr. Brubaker's admission, it is undisputed that the decision ***not*** to lower the top drive below the monkey board was made—not by H&P—but by ***W&T***.[211] And this decision—again, undisputedly—caused this incident.[212] Notably, W&T's decision not to

---

[205]   Exhibit 1, W&T corporate deposition, pp. 45:24-47:9; Exhibit 7, Deposition of Scotty Brubaker, p. 34:14-21; Exhibit 11, Deposition of Tommy Bridges, pp. 71:19-72:18.

[206]   Exhibit 3, Deposition of Atlas Harrington, pp. 47:13-48:21, pp. 50:2-52:4, p. 54:2-6, and p. 71:2-19.

[207]   Exhibit 1, W&T corporate deposition, p. 58:14-17 and p. 175:5-14. *See also* Exhibit 2, Deposition of Andy Cline, pp. 39:24-41:17; Exhibit 3, Deposition of Atlas Harrington, pp. 122:1-123:7; Exhibit 4, Deposition of Keim Davis, p. 107:12-17; Exhibit 6, H&P corporate deposition, p. 269:21-25; Exhibit 7, Deposition of Scotty Brubaker, p. 24:12-25; Exhibit 11, Deposition of Tommy Bridges, p. 25:9-20; Exhibit 13, Deposition of Stephen Walker, pp. 26:23-27:5.

[208]   Exhibit 5, Deposition of Jason Parkman, pp. 81:17-82:6; Exhibit 1, W&T corporate deposition, pp. 34:8-36:19; Rec. Doc. 134-11, Edward Ziegler's report, p. 17 of 30.

[209]   *Id. see also* Exhibit 11, Deposition of Tommy Bridges, pp. 92:13-95:25 and pp. 96:20-98:7; Exhibit 13, Deposition of Stephen Walker, pp. 28:17-30:2 and pp. 38:20-39:9.

[210]   Exhibit 7, Deposition of Scotty Brubaker, pp. 49:1-50:10, pp. 52:22-53:25, pp. 96:25-97:4, and p. 99:13-18.

[211]   Exhibit 1, W&T corporate deposition, p. 52:10-20.

[212]   Exhibit 4, Deposition of Keim Davis, pp. 119:20-121:25 and p. 122:12-22; Exhibit 5, Deposition of Jason Parkman, p. 178:20-23; Exhibit 6, H&P corporate deposition, p.

lower the top drive below the monkey board is unjustifiable in light of the evidence. This is so because (1) the top drive could have been lowered 10-15 feet slowly as to avoid the risk of any potentially loose components falling to the rig floor,[213] (2) the falling hazard was not a "true" hazard, anyway, since the top drive would have been lowered without the need to have any personnel standing on the rig floor where they could have been struck by a falling object,[214] and (3) lowering of the top drive by 10-15 feet would not have increased the risk of the drillstring getting re-stuck because the bottomhole assembly would have still been sitting 46 feet above where the pipe got stuck initially.[215] Besides, even the pipe could have gotten stuck again—which could have happened regardless of what W&T decided to do—it would have simply been jarred again.[216] The only issue there, of course, is that any additional jarring would have delayed W&T's drilling operations further.[217]

And the *fourth* way that shows how W&T controlled the lifting operation is evident from the type of the winch used to lift Mr. Parkman. Indeed, W&T had a

---

272:11-15 and pp. 305:21-306:23; Exhibit 9, Deposition of Robert Myers, Jr., p. 23:21-23; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 45:23-46:3; Exhibit 13, Deposition of Stephen Walker, pp. 94:25-95:17 and p. 80:3-7.

[213] Exhibit 1, W&T corporate deposition, pp. 45:24-47:9; Exhibit 11, Deposition of Tommy Bridges, pp. 71:19-72:18.

[214] Exhibit 6, H&P corporate deposition, pp. 298:1-299:22; Exhibit 11, Deposition of Tommy Bridges, p. 73:11-16.

[215] Exhibit 1, W&T corporate deposition, p. 80:4-23 and p. 83:9-18; Exhibit 23, top drive position and salt location data.

[216] Exhibit 1, W&T corporate deposition, p. 84:1-9; Exhibit 6, H&P corporate deposition, pp. 301:19-302:16; Exhibit 7, Deposition of Scotty Brubaker, pp. 33:15-34:6.

[217] Exhibit 1, W&T corporate deposition, p. 84:1-9; Exhibit 7, Deposition of Scotty Brubaker, pp. 33:15-34:6 and p. 35:7-12.

duty[218]—and an opportunity—to use engineering practices to reduce the hoist-related hazards. And W&T could have done so by changing the type of winch that was being used on its platform for hoisting. Specifically, instead of using a certified man-riding winch,[219] W&T could have—just like its competitors in the industry[220]—used a dedicated man-riding winch with overpull feature.[221] To be clear, in its contract with H&P, W&T had the discretion to request that H&P install these auto-stop winches on W&T's platform.[222] And had W&T done so, this incident could have been avoided.[223] How? Because this winch's overpull mechanism would have allowed it to automatically shut itself off the very second that Mr. Parkman's lanyard got snugged on a monkey board finger.[224] But, perhaps wary of the cost that W&T would have incurred in purchasing these winches, W&T decided against it.[225]

Therefore, the evidence shows that (1) Mr. Parkman was injured during the hoisting operation, and (2) it was W&T that controlled the hoisting operation and that it, with its poor decision-making, made the hoisting imminently dangerous. The evidence

---

[218]  CFR § 250.107 (a)(3). *See also* Exhibit 4, Deposition of Keim Davis, p. 102:8-23; Exhibit 6, H&P corporate deposition, pp. 251:9-252:13, p. 253:5-13, and p. 254:9-16; Exhibit 15, W&T fall protection procedure at WT 000256-57.

[219]  Exhibit 4, Deposition of Keim Davis, p. 118:11-25.

[220]  Exhibit 6, H&P corporate deposition, pp. 330:3-331:16.

[221]  Exhibit 4, Deposition of Keim Davis, pp. 114:6-115:4 and pp. 116:8-117:4; Exhibit 22, H&P personnel hoisting/manriding policy, para. 39.8.

[222]  Exhibit 4, Deposition of Keim Davis, pp. 114:6-115:4 and pp. 116:8-117:4; Exhibit 22, H&P personnel hoisting/manriding policy, para. 39.8.

[223]  Exhibit 4, Deposition of Keim Davis, pp. 119:20-121:25 and p. 122:12-22; Exhibit 6, H&P corporate deposition, p. 49:2-25; Exhibit 7, Deposition of Scotty Brubaker, p. 129:4-13.

[224]  Exhibit 6, H&P corporate deposition, p. 49:2-25

[225]  Exhibit 1, W&T corporate deposition, p. 212:16-213:7; Exhibit 6, H&P corporate deposition, pp. 330:3-331-16; Exhibit 4, Deposition of Keim Davis, pp. 116:8-117:4 and p. 119:6-11.

also shows that H&P was **not** entirely free to control **any** steps surrounding the hoisting operation[226]—especially considering that W&T "overruled" some of H&P's requests in this regard.[227]  At the very minimum, genuine issues exist as to whether W&T exercised operational control over H&P in this regard and its motion should be denied.

> ### 2.     Genuine factual issues exist as to whether W&T gave an express or implied authorization for an unsafe work practice.

Another way to preserve a vicarious liability claim is to show that the principal gave express or implied authorization for its independent contractor's unsafe practice.[228] Louisiana law provides exactly that:

> Where an available safe method, which **includes the taking of adequate precautions**, will render it at least ordinarily safe, and the work is done in an unsafe manner, the employer will be liable if he has expressly or impliedly authorized the particular manner which will render the work unsafe, and not otherwise.[229]

Applying this rule here is straightforward. W&T did not only make Mr. Parkman's lift incredibly dangerous, but it also allowed it to proceed. Namely, W&T knew that a JSA was required for the hoisting operation[230]—both under H&P and W&T's policies.[231] And W&T knew that it shared the responsibility for the JSA with H&P.[232] In

---

[226]     *Dixon v. Danos & Curole Marine Contractors, Inc.*, 1998 WL 812393, at *2 (E.D. La. 1998) (citing *Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471 (5th Cir. 1989)) (emphasis added).

[227]     Exhibit 5, Deposition of Jason Parkman, pp. 42:5-43:10, pp. 57:17-59:23, p. 63:1-13, and p. 151:13-22.

[228]     *Villaronga v. Gelpi P'ship No. 3,* 536 So. 2d 1307, 1310 (La. App 1st Cir. 1988).

[229]     *Ewell v. Petro Processors of Louisiana, Inc.,* 364 So. 2d 604, 606–07 (La. App. 1st Cir. 1978) (emphasis added).

[230]     Exhibit 1, W&T corporate deposition, p. 182:5-11; Exhibit 4, Deposition of Keim Davis, pp. 90:19-91:9.

[231]     Exhibit 7, Deposition of Scotty Brubaker, p. 64:1-5; Exhibit 11, Deposition of Tommy Bridges, p. 80:14-18; Exhibit 14, W&T JSA policy at WT000272.

fact, the federal law required W&T to understand the job at hand and its hazards as thoroughly as H&P, to weigh in on the potential risks, and to allow the job to proceed *only* upon being satisfied that it can be performed safely.[233] And had W&T done what the federal law required it to do, the hoisting operation—and this incident—would have never taken place. Two reasons show why.

*One*, had W&T taken the JSAs as seriously as it was required to do, its company man on duty—Scotty Brubaker—would have easily realized that the JSA did not address the static line being tied off—but the SRL, which has different features[234] and which was not used at the time of the incident.[235] Also, if the static line was tied off at the time of the incident—which is disputed by the evidence[236]—and one of the causes of this incident—which is also challenged by the evidence[237]—Mr. Brubaker could have seen

---

[232] Exhibit 1, W&T corporate deposition, p. 139:14-25; Exhibit 12, Deposition of Willis (Tot) Lee, p. 30:14-22; Exhibit 4, Deposition of Keim Davis, pp. 93:17-95:1; Exhibit 6, H&P corporate deposition, p. 46:11-25, p. 179:16-19, and p. 327:8-14; Exhibit 13, Deposition of Stephen Walker, pp. 42:16-45:6; Rec. Doc. 135-6, Eugene Sweeney's report, pp. 11-12 of 25.

[233] Exhibit 4, Deposition of Keim Davis, p. 88:2-22, p. 94:13-19, and p. 102:8-23; Exhibit 5, Deposition of Jason Parkman, pp. 40:8-42:4 and p. 105:2-12; Exhibit 6, H&P corporate deposition, pp. 289:17-290:18 and pp. 293:4-17; Exhibit 7, Deposition of Scotty Brubaker, p. 67:1-6, p. 68:4-23, and pp. 69:18-70:8; Exhibit 10, Deposition of Ronnie Atkinson, p. 79:1-5; Exhibit 11, Deposition of Tommy Bridges, pp. 85:2-88:23; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 32:1-33:, pp. 34:17-35:11, p. 36:12-18, and pp. 61:16-63:4.

[234] Exhibit 4, Deposition of Keim Davis, pp. 114:6-115:4 and pp. 116:8-117:4; Exhibit 22, H&P personnel hoisting/manriding policy, para. 39.8.

[235] Exhibit 1, W&T corporate deposition, pp. 144:14-145:7; Exhibit 5, Deposition of Jason Parkman, pp. 122:21-123:22.

[236] Exhibit 3, Deposition of Atlas Harrington, pp. 94:3-99:15, p. 101:10-17, pp. 102:1-105:21, pp. 109:24-113:12, and pp. 116:5-117:21; Exhibit 11, Deposition of Tommy Bridges, pp. 43:11-44:21.

[237] Exhibit 1, W&T corporate deposition, pp. 149:15-150:2, p. 244:1-23, pp. 245:24-245:4, pp. 248:24-249:13, and p. 247:10-24; Exhibit 4, Deposition of Keim Davis, pp. 95:18-96:13 and pp. 77:4-78:25; Exhibit 6, H&P corporate deposition, p. 168:5-9 and pp.

that with his own eyes if he only bothered to look.[238] So, to the extent that W&T finds

this to be a cause of the incident, it is one of its own making.

And *two,* had W&T taken the JSAs as seriously as it was required to do, it would

have trained Mr. Brubaker on its policies and procedures that required him to sign off on

"all JSAs" before allowing the job to proceed.[239] But W&T did not that, either.[240] As a

result, because he did not know any better,[241] Mr. Brubaker did not sign the two JSAs in

question.[242] So, not only did Mr. Brubaker not sign the JSAs that concerned the hoisting

operation that caused Mr. Parkman's injuries, but he did not sign *any* JSAs before

---

340:19-341:9; Exhibit 7, Deposition of Scotty Brubaker, pp. 129:17-130:15; Exhibit 13, Deposition of Stephen Walker, pp. 95:20-96:13.

[238]    Exhibit 1, W&T corporate deposition, p. 144:14-145:7; Exhibit 10, Deposition of Ronnie Atkinson, p. 77:3-21; Exhibit 11, Deposition of Tommy Bridges, pp. 40:19-42:12 and p. 77:4-20; Exhibit 3, Deposition of Atlas Harrington, pp. 113:23-115:1; Exhibit 6, H&P corporate deposition, pp. 131:25-132:10 and p. 134:2-14.

[239]    Exhibit 1, W&T corporate deposition, p. 162:17-20 and pp. 215:9-217:21; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 30:23-31:4 and pp. 37:4-39:14; Exhibit 14, W&T JSA policy at WT000273; Exhibit 4, Deposition of Keim Davis, pp. 86:21-87:25 and pp. 91:19-92:11; Exhibit 6, H&P corporate deposition, p. 153:4-9, p. 241:7-9, p. 282:6-13, pp. 284:25-286:23; Exhibit 13, Deposition of Stephen Walker, p. 36:12-17; CFR §250.1911(b)(2)-(3) ("(2) The immediate supervisor of the crew performing the job onsite must conduct the JSA, sign the JSA, and ensure that all personnel participating in the job understand and sign the JSA. (3) The individual you designate as being in charge of the facility must approve and sign all JSAs before personnel start the job."); Rec. Doc. 135-6, Eugene Sweeney's report, pp. 7-8 of 25.

[240]    Exhibit 7, Deposition of Scotty Brubaker*,* pp. 60:4-61:5, p. 63:17-24, and pp. 125:23-126:22. *See also* Exhibit 7, Deposition of Scotty Brubaker, p. 29:12-17, p. 37:22-38:12, and p. 71:20-23. And neither did AGR. *See id.* at pp. 81:21-82:1 and pp. 82:2-84:20.

[241]    Exhibit 7, Deposition of Scotty Brubaker, p. 66:4-25.

[242]    Exhibit 1, W&T corporate deposition, p. 105:20-25, pp. 109:22-110:1, and p. 188:19-23 Exhibit 2, Deposition of Andy Cline, pp. 23:20-24:2; Exhibit 4, Deposition of Keim Davis, p. 92:12-22 and pp. 105:11-106:8; Exhibit 5, Deposition of Jason Parkman, pp. 112:22-113:9; Exhibit 6, H&P corporate deposition, p. 177:12-21 and p. 294:4-8; Exhibit 12, Deposition of Willis (Tot) Lee, pp. 58:7-60:11; Exhibit 13, Deposition of Stephen Walker, pp. 37:21-38:15; Rec. Doc. 135-6, Eugene Sweeney's report, p. 8 of 25.

allowing jobs to proceed[243]—making it only a matter of time that an incident such as this one would happen.[244]

Thus, the evidence shows that W&T authorized the hoisting procedure to proceed by failing to conduct a proper, thorough JSA with H&P and train its company man to be involved in the process. At minimum, genuine factual issues preclude summary judgment.

### 3.    Genuine issues of fact also exist as to whether W&T was independently negligent.

While the independent contractor rule shields a principal from the acts of its independent contractor that do not fall under the two aforementioned exceptions, the principal remains liable for its own negligence.[245] A negligence claim in Louisiana has five elements, but duty is the first one.[246] W&T centers its motion on an argument that it owed Mr. Parkman no legal duty of care. Accordingly, this opposition has the same focus.

The law on this issue is undisputed. Duty is a question of law.[247] But "the particular facts and circumstances of each individual case determines the extent of the duty and the resulting degree of care necessary to fulfill the duty."[248] By being the owner of the platform—under Louisiana law—W&T had a duty to H&P's employees to provide

---

[243]    Exhibit 7, Deposition of Scotty Brubaker, pp. 67:19-68:1.

[244]    Exhibit 6, H&P corporate deposition, pp. 290:19-291:4.

[245]    *Graham v. Amoco Oil Co.,* 21 F.3d 643, 645 (5th Cir. 1994); *Echeverry v. Jazz Casino Co., L.L.C.,* 988 F.3d 221, 228 (5th Cir. 2021).

[246]    *Pinsonneault v. Merchants & Farmers Bank & Trust Co.*, 01-2217 (La. 4/3/02), 816 So. 2d 270, 275-76.

[247]    *Harris v. Pizza Hut of Louisiana, Inc.,* 455 So. 2d 1364, 1371 (La. 1984).

[248]    *Socorro v. City of New Orleans,* 579 So. 2d 931, 938 (La. 1991).

reasonably safe premises for work.[249] And, as federal courts have recognized, the duty of a platform-owner to ensure the safety of the premises is implicated when it creates the hazardous condition at issue.[250]

That is exactly what happened here. In several ways described above, W&T created an extremely dangerous environment for conducting the hoisting operation. Therefore, the record evidence precludes a summary judgment in W&T's favor on this ground, as well.

## IV.    CONCLUSION

The Court should deny W&T's motion in its entirety.

Respectfully submitted,

ARNOLD & ITKIN LLP

*/s/  Roland Christensen*
Roland Christensen, Roll #37440
rchristensen@arnolditkin.com
6009 Memorial Drive
Houston, Texas 77007
Tel: 713.222.3800
Fax: 713.222.3850

CLAYTON, FRUGE, & WARD
A.M. "Tony" Clayton (#21191)
Michael P. Fruge (#26287)
Richard J. Ward, III (#32267)
3741 La. Highway 1 South
Port Allen, Louisiana 70767
Tel: 225.344.7000
Fax: 225.383.7631

Attorneys for the plaintiff, Jason Parkman

---

[249]   *Abernathy v. Spie Grp., Inc.,* 1990 WL 62021, at *5 (E.D. La. 1990) ("The owner or operator of a facility also has a duty to provide persons on its premises with a safe place to work."). *See also Manning v. Dillard Dep't. Stores, Inc.*, 99-1179 (La. 12/10/99), 753 So. 2d 163, 165.

[250]   *Venezia v. ConocoPhillips Co.,* 2014 WL 107962, at *6 (E.D. La. 2014); *Thomas v. Burlington Res. Oil and Gas Co.*, 2000 WL 1528082 at *2 (E.D. La. 2000).

**CERTIFICATE OF SERVICE**

I certify that a copy of this pleading was served upon all counsel of record this 21st day of February, 2023 by e-filing it into the CM/ECF system, which will automatically deliver a copy to all counsel.

*/s/  Roland Christensen*

Roland Christensen